EDITH G. McKINNEY and ESTATE OF JAMES R. McKINNEY, DECEASED, EDITH G. McKINNEY, EXECUTRIX, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
McKinney v. Commissioner
Docket No. 5437-78.
United States Tax Court
T.C. Memo 1981-181; 1981 Tax Ct. Memo LEXIS 563; 41 T.C.M. (CCH) 1272; T.C.M. (RIA) 81181; April 15, 1981. *563 Held, petitioners' rental of their Hawaiian condominium is an activity engaged in for profit; Held further, a previous judgment against petitioners in a refund action for different taxable years does not estop petitioners from litigating the issues in the instant case; Held further, allowable deductions determined under section 212 and also under section 280A for 1976. James R. McKinney, pro se. [1]
Leroy D. Boyer, for the respondent. NIMS
MEMORANDUM FINDINGS OF FACT AND OPINION NIMS, Judge: Respondent determined deficiencies in petitioners' income tax for the years 1974, 1975 and 1976 in the respective amounts of $ 1,770.99, $ 2,411.69 and $ 1,206.38. The issues for decision are: (1) whether deductions claimed with respect to the renting of a Hawaiian condominium are limited as provided in section 183; [2] (2) whether a judgment entered in Edith G. and James R. McKinney v. United States, No. CIV-0805-T (W.D. Okla. Nov. 23, 1977), *564 in favor of the United States for the taxable years 1970 and 1971, operates as an estoppel against the petitioners as to the matters at issue in this case; and (3) whether various expenses are rendered non-deductible by virtue of either section 262 or section 280A. FINDINGS OF FACT At the time the petition in this case was filed, petitioners resided in Oklahoma City, Oklahoma. During the years 1974, 1975 and 1976, petitioner James R. McKinney was employed as the First Assistant District Attorney of Oklahoma City, Oklahoma. Petitioner Edith G. McKinney is also a licensed attorney. In November of 1966, petitioners purchased a condominium apartment in Honolulu, Hawaii, for $ 56,000 with the purchase price allocated as follows: $ 12,500 for the land, $ 36,750 for the apartment and $ 7,000 for furnishings. Petitioners learned of the apartment when they had been in Hawaii earlier that year on vacation. This apartment is located in the Ilikai Apartment Building (the "Ilikai"), a high-rise apartment building near Waikiki Beach. Petitioners *565 did not consult with any investment counselors, real estate investment brokers or anyone else familiar with investment realty in Hawaii prior to their acquisition. They did speak to the previous owner about the property's value and future income-producing potential. At that time petitioners had experience renting a three-unit apartment house, single-family dwellings and a three-unit business property in Oklahoma City. After petitioners acquired the Hawaiian apartment, they listed it for rental with Capitol Investment Co., Ltd. ("Capitol"), the rental agency for the Ilikai. Petitioners also concurrently listed the apartment for rent with Harold and Doris Estes, two friends who lived in Hawaii, and William F. Lee. Petitioners agreed to pay Capitol, Lee and the Esteses a percentage commission for any rentals procured. In order to make the apartment more attractive to potential lessees, the use of a car was to be included in the rental price. From late 1966 until August of 1968, all of the apartment rentals were obtained through the efforts of Capitol. During that time petitioners were satisfied with the Capitol listing. Petitioners were especially pleased with the efforts of the *566 Capitol employee responsible for their listing, Darlene Fillius. They felt she took a special interest in the apartment. In November of 1968, petitioners attempted to contact Fillius. They were concerned because the apartment had not been rented since August of that year. After learning that Fillius was no longer employed by Capitol, petitioners contacted its general manager, Frank Kelly, and made arrangements to meet with him in Hawaii to discuss the renting of the apartment. After meeting with Kelly in late December of 1968, it was petitioners' belief that Capitol could not properly look after the apartment or procure rentals on a continuing basis. As a consequence, they terminated their arrangement with Capitol on January 6, 1969. Subsequently, petitioners personally assumed responsibility for managing the rentals of the apartment. They continued their listing with Harold and Doris Estes. Petitioners also listed the apartment with nine travel agencies in Oklahoma City and with the former owner, Charles Stevenson. In addition, petitioners utilized limited advertising by newspaper and also relied upon word-of-mouth publicity. Petitioners relied upon Doris Estes for maintenance *567 and general cleaning duties. Nonetheless, rentals were still well below capacity and continued that way for several years. In 1973, between June 28 and August 27, petitioners spent approximately 48 days at the apartment for purposes of completely remodeling it. This effort included installing new drapes and carpeting, obtaining new furniture and a new television set and the making of various repairs. Petitioners also acquired a new Toyota for the use of potential lessees. In December of 1973, when the apartment was completely remodeled, petitioners notified the Ilikai's rental office and informed it that the newly decorated apartment was available for rent. Petitioners agreed to pay the rental office a commission of 15 percent for any rentals it obtained. After the apartment was remodeled, pictures of it were taken and an advertising album was made. Petitioners also began to use newspaper advertising with greater frequency. In 1976, petitioners made further improvements to the property by adding an ice maker, new refrigerator and an electric range. Petitioners personally occupied their condominium apartment during the taxable years 1974, 1975 and 1976 as follows: Year
Days Occupied
1974
15
1975
15
1976
20
During *568 1974, 1975 and 1976, the total number of days which petitioners rented their apartment were as follows: Year
No. of Days Rented
1974
49
1975
48
1976
85
The following chart indicates gross income, depreciation, cash expenses exclusive of depreciation and the net profit or loss which petitioners claimed on their tax return for each of the years between 1966 and 1979. Cash
Net Profit
Expenses
or (Loss)
(Excluding
Total
(Including
Year
Rental Income
Depreciation)
Depreciation
Depreciation)
1966
$ 550.00
$ 1,529.07
$ 1,888.25
($ 2,867.32)
1967
5,375.00
6,330.52
2,506.95
( 3,462.47)
1968
4,673.75
8,110.97
2,482.61
( 5,919.83)
1969
1,518.80
4,755.45
2,884.27
( 6,120.92)
1970
936.00
6,016.65
2,409.94
( 7,490.59)
1971
840.00
5,403.14
2,146.56
( 6,709.70)
1972
1,091.00
4,480.51
2,128.57
( 5,518.08)
1973
2,440.58
6,061.31
4,332.88
( 7,953.61)
1974
3,138.30
4,199.84
2,916.44
( 3,977.98)
1975
3,098.00
6,518.40
2,689.68
( 6,110.08)
1976
6,032.00
5,888.88
2,931.81
( 2,788.69)
1977
7,165.00
6,106.62
2,667.90
( 1,609.52)
1978
10,085.18
6,678.44
2,731.00
675.74 1979
11,455.00
7,616.29
2,050.78
1,787.93  For the taxable year 1974, the petitioners claimed the following expenses in connection with their Hawaiian condominium apartment: ITEM
AMOUNT
Monthly Maintenance
$ 1,248.00
Insurance
126.00
Telephone
125.42
Advertising & For Rent
235.33
Real Estate Tax
607.86
Excise Tax
120.70
Rental Commission
456.40
Laundry
33.28
Repairs
27.42
Tenant Expense
3.00
Owner's Expense
633.64
1973 Toyota: Safety Sticker
3.25
Gas
11.35
Repairs
37.44
Insurance
229.00
Parking
300.00
Wash
1.75
Depreciation
2,916.44
TOTAL EXPENSES
$ 7,116.28
For *569 the taxable year 1975, the petitioners claimed the following expenses in connection with their Hawaiian condominium apartment: ITEM
AMOUNT
Monthly Maintenance
$ 1,569.05
Telephone
144.61
Repairs
156.21
Cleaning Supplies
136.83
Laundry
72.07
For Rent Ads
366.80
Advertising Film
70.02
Rental Commission
443.70
Excise Tax on Rentals
98.42
Real Estate Tax
600.85
Owner's Expense: Airline
1,727.07
Eats
394.57
Car Expense: Insurance
223.00
Gas
31.15
Repairs
163.47
Parking
300.00
Tag
20.58
Depreciation
2,689.68
TOTAL EXPENSES
$ 9,208.08 For the taxable year 1976, the petitioners claimed the following expenses in connection with their Hawaiian condominium apartment: ITEM
AMOUNT
Monthly Maintenance
$ 1,632.00
Repairs
183.49
Cleaning Expenses
67.30
Insecticide
24.75
Laundry
173.31
Telephone
123.56
Rental Commissions
978.50
Excise Tax
192.80
Excise Tax License
2.50
Advertising: Pictures
54.60
Newspaper
42.00
Ad to Sell Stove
10.19
Postage
2.03
Real Estate Tax
576.26
Owner's Expense: Airline
552.00
Meals
435.04
Car: Gas-Charge Battery and
Safety Sticker
35.36
Repairs
89.61
Insurance
330.00
Parking Stall
360.00
License
23.58
Depreciation
2,931.81
TOTAL EXPENSES
$ 8,820.69
During each of the years in issue, petitioners traveled to Hawaii for a vocation. Except for a number of out-of-state *570 football games and some short trips to visit friends, petitioners' vacations during the years in issue were limited to their trips to Hawaii. While they were in Hawaii petitioners also spent a portion of their time (not a majority) effecting repairs to the apartment. All of the travel expenses which petitioners incurred in traveling to and from Hawaii, and all of the meal expenses incident to this travel were deducted by petitioners on their tax return for each respective year. In Edith G. and James R. McKinney v. United States, No. CIV-76-0805-T (W.D. Okla. November 23, 1977), a civil refund action instituted by the petitioners herein, a judgment in accordance with a jury verdict was entered against the petitioners. The issue in that case was whether petitioners' ownership of the Hawaiian condominium for the taxable years 1970 and 1971 was an activity not engaged in for profit within the meaning of section 183. At the conclusion of the trial, the jury found that petitioners had failed to prove that their primary purpose in holding the apartment during 1970 and 1971 was one of profit. On appeal, the judgment was affirmed by the United States Court of Appeals for the Tenth Circuit. *571 The value of petitioners' condominium in 1977 was $ 174,000. In 1977, the projected rate of appreciation for the apartment was approximately 25 percent every year and a half. As of the date of the trial in this case, petitioners have never offered their apartment for sale. OPINION The first issue for decision is whether petitioners' activity in connection with owning and renting their Hawaiian condominium is an activity not engaged in for profit within the meaning of section 183. Respondent argues that petitioners' rental-related expenditures are subject to the section 183 limitations as petitioners could not have, in good faith, expected that their rental activity would generate a profit. Of course, petitioners' position is to the contrary. Section 183(c) defines not-for-profit activity as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or paragraph (1) or (2) of section 212." The issue of whether an activity is engaged in for profit involves a reference to objective standards. Section 1.183-2, Income Tax Regs.
The regulations under section 183 list some of the relevant factors (none of which alone is determinative) *572 to be considered in ascertaining whether a taxpayer is engaged in a profit activity. These factors include: (1) the manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that the assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profit, if any, which is earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. Section 1.183-2(b), Income Tax Regs. After carefully considering all of the evidence presented in light of the above-mentioned considerations, we believe petitioners have established that a profit purpose predominated their activity in connection with the Hawaiian apartment during the years in issue. Respondent argues that petitioners' history of continuous and substantial losses in renting their apartment is highly probative as to their lack of profit motive. However, as previously indicated, *573 this one factor alone is not determinative. See Churchman v. Commissioner, 68 T.C. 696 (1977). Furthermore, the loss history is outweighed by other factors, including petitioners' eventual success in generating a profit from the apartment. The evidence adduced shows that petitioners sustained continued losses from 1966 until 1977. Their gross rental income for the property increased in 1974 and 1975, rose significantly in 1976, and continued to increase each year between 1977 and 1979. In fact, gross rental income has exceeded petitioners' out-of-pocket expenses continually since 1976.In addition, a net profit (including depreciation) was reported for 1978 and 1979. Although the years beyond 1976 are not in issue, we believe that petitioners' success in subsequent years negates respondent's argument that petitioners' continued history of losses belies a profit motive. See Abrams v. United States, 449 F.2d 662, 663 (2d Cir. 1971). The evidence also demonstrates that this turnaround was no mere fluke. Changes in petitioners' method of operation, one of the relevant considerations, can partly explain the increase in rental income. See Engdahl v. Commissioner, 72 T.C. 659, 661 (1979); *574 section 1.183-2(b), Income Tax Regs.In 1973, after over four years of dismal rentals, petitioners spent a substantial amount of time, effort and money in remodeling the apartment. This fact was conveyed to the Ilikai rental office and also to various people via petitioners' word-of-mouth campaign, specifically through the use of an advertising photo album. In contrast to previous years, petitioners also employed newspaper advertising to a greater degree. We believe that the various changes petitioners undertook in 1973 and thereafter, particularly their capital improvements, support a finding that petitioners possessed a bona fide expectation of profit during the years in issue. But cf. Carkhuff v. Commissioner, 425 F.2d 1400 (6th Cir. 1970), aff'g. a Memorandum Opinion of this Court (repairs and improvements do not compel a finding of profit motive as they could also be intended to satisfy personal tastes and comforts of taxpayers during their personal use). [3] *575 In an effort to demonstrate that petitioners' rental activity was not conducted in a sufficiently business-like manner, respondent has characterized their efforts to obtain rentals of the apartment as spasmodic and half-hearted. In particular, respondent notes that newspaper advertising was limited to papers in the Oklahoma City area and that petitioners have not engaged the services of a rental agency since 1969. It is true that newspaper advertising was limited to Oklahoma City. However, that was not petitioners' only means of obtaining rentals. Petitioners also relied heavily on word-of-mouth advertising through friends and relatives. Contrary to respondent's assertion, the facts also indicate that the Ilikai rental office was informed of the apartment's remodeling in late 1973 and of petitioners' willingness to compensate the Ilikai office for any rentals procured. Although more newspaper ads could have been placed in a greater variety of newspapers, any second guessing as to this matter still would not tip the *576 scale in favor of respondent. Indeed, the eventual success of petitioners' approach, as evidenced by the continued increase in gross rental income after 1975, bears out the bona fides of their profit expectations insofar as their advertising methods are concerned. Petitioners were, after all, dealing only with a single condominium unit, not an entire complex, so that an advertising campaign of greater magnitude might, in any event, reasonably have been considered economically unjustified.
The record also contains various indicia of the business-like way in which petitioners conducted their rental activity. Petitioners retained all of the correspondence and documents relating to the apartment. These items, which included a list of the ads taken out, the photo album and a detailed statement indicating income and categorized expenses for each year, were introduced by petitioners in support of their case. Respondent's contention that petitioners' activity was conducted in a haphazard, nonbusiness-like manner is unsubstantiated. We cannot agree with respondent's assertions that petitioners' non-apartment income and their personal use of the property were both substantial. Although the *577 evidence indicates that petitioners were clearly not destitute, their income from other sources was not so great as to warrant an inference that continued losses from the property was a matter petitioners could cavalierly dismiss. Their personal use of the property was approximately two weeks in 1974 and 1975 and approximately three weeks in 1976, hardly a substantial amount of personal use for vacation purposes. Compare Carkhuff v. Commissioner, supra.
Finally, we believe that petitioners' failure to consult real estate professionals or investment counselors prior to their purchase of the property offers limited probative value. Petitioners were familiar with Hawaii as an attractive location for owning property as they had visited it before. They spoke with the previous owner as to his views on the condominium.Petitioners also had had considerable experience in investing in real estate in Oklahoma City, and therefore were not complete neophytes in this line of endeavor. We do not believe that a significant amount of investment advice was necessary for petitioners to comprehend that a condominium in a modern high-rise building near Waikiki Beach would eventually prove to be a *578 good investment. Petitioners testified that they anticipated that the condominium would appreciate significantly in value. The reasonableness and good faith of this expectation is buttressed by the testimony of William J. Hart, Jr., a qualified expert, who stated that the property's value in 1977 was $ 174,000 with a projected increase in value of 25 percent every one-and-a-half years. After reviewing all of the evidence herein, we find that petitioners' activity in connection with their holding of the Hawaiian condominium was engaged in for profit and thus not subject to the limitations contained in section 183. The next issue for decision is whether petitioners are collaterally estopped from litigating the issue of their profit motive vis-a-vis the Hawaiian condominium. Respondent argues that the judgment entered against petitioners in Edith G. and James R. McKinney v. United States, No. CIV-76-0805-T (W.D. Okla. Nov. 23, 1977) operates to estop them from relitigating that issue in the instant case because the controlling facts, legal principles and issues in that case are the same as those herein. The doctrine of collateral estoppel operates to bar a party from relitigating *579 those matters actually litigated in a previous suit. Commissioner v. Sunnen, 333 U.S. 591 (1948). Under that doctrine, "once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits * * * involving a party to the prior litigation," even though the subsequent suits may be based on different causes of action. Montana v. United States, 440 U.S. 147, 153 (1979).An application of this fundamental principle demonstrates that respondent's reliance on collateral estoppel is misplaced. The issue of whether petitioners were engaged in an activity for profit during 1974, 1975 and 1976 is different from the issue of whether their apartment activity during 1970 and 1971 was engaged in for profit. Whether property is held for the production of income under section 212 (and thus beyond the scope of section 183) requires an annual determination; petitioners must demonstrate that the property was being used for a profit-seeking purpose during the years in issue. See Meredith v. Commissioner, 65 T.C. 34, 41 (1975).
This point is intertwined with our conviction that, regardless of what transpired during 1970 and 1971, *580 subsequent facts indicate that, from 1974 on, petitioners possessed a bona fide expectation of profit because of the change in their method of operation. The evidence supports a finding that what may have been personal-use property prior to 1974 was converted to property held for the production of income for 1974 and thereafter because of petitioners' expanded efforts to secure additional rentals. See Bradley v. Commissioner, 26 T.C. 970 (1956). Accordingly, since the controlling facts have also changed since 1970 and 1971, see Montana v. United States, supra, at 155, we must decline respondent's invitation to invoke the doctrine of collateral estoppel. Next we consider the extent to which the expenses petitioners claimed are non-deductible personal expenses under section 262. In particular, respondent insists that petitioners' travel, meals and automobile expenses were not sufficiently proximate to their rental activity to warrant a deduction.
Notwithstanding our finding that petitioners were engaged in a profit activity, only those expenses which are reasonable and bear a proximate relation to petitioner's profit-seeking activity are deductible. Section 1.122-1(a), Income Tax Regs. *581 During the three years in issue, petitioners deducted the cost of traveling to and from Hawaii as well as their expenses for meals while in Hawaii (designated on their 1974, 1975 and 1976 returns as "Owner's expense"). Although petitioners testified that they spent most of their time in Hawaii repairing and refurbishing their apartment, we are more inclined to believe that their trips to Hawaii were oriented primarily toward vacation and recreation purposes. Even though work in connection with the apartment may have been performed, petitioners have failed to establish that such was the primary reason for their travel and meal expenses. Cf. Mazzotta v. Commissioner, 57 T.C. 427 (1971), aff'd per curiam, 465 F.2d 1399 (2d Cir. 1972); section 1.162-2 Income Tax Regs. As a consequence we consider them non-deductible personal expenditures under section 262. Respondent also argues that the expenses in connection with maintaining an automobile in Hawaii are similarly non-deductible by virtue of section 262. On this point we side with petitioner. It is evident that the inclusion in the rental price of the use of an automobile would provide an added attraction to potential lessees and *582 thus facilitate rental of the apartment. The automobile remained permanently in Hawaii and thus was available to petitioners for their personal use at most for only their brief two- for three-week annual sojourn in that State.Thus we consider the expenses incurred in connection with the automobile sufficiently proximate to petitioners' rental activities to warrant a deduction under section 212. Respondent next contends that even if petitioners were engaged in a profit-making activity, then section 262 should disallow all allocable expenses and depreciation to the extent of petitioners' personal use. Respondent quotes from the following regulation in support of this position: (2) Rules for allocation of expenses. -- If the taxpayer is engaged in more than one activity, an item of deduction or income may be allocated between two or more of these activities. Where property is used in several activities, and one or more of such activities is determined not to be engaged in for profit, deductions relating to such property must be allocated between the various activities on a reasonable and consistently applied basis. [Sec. 1.183-1(d)(2) Income Tax Regs.] Based upon the facts and circumstances *583 appearing in this record, see section 1.183-1(d)(3)(ii), Income Tax Regs., we feel that the expenses which are attributable to petitioners' apartment (other than those which would be allowable in any event, e.g., real property taxes and interest), should be disallowed to the extent of petitioners' personal use. [4] Although respondent argues that no deductions should be allowed because petitioners have failed to produce evidence to provide a reasonable basis for allocation, the record herein suggests a rational basis for determining petitioners' personal use of the property. In our view, the most appropriate method of allocating the various expenses to petitioners' personal use is by using a ratio of their personal use of the property over the total number of days the property was used. The respective ratios for 1974 and 1975 are 15/64 and 15/63 or 23 and 24 percent respectively. As a consequence, only 77 percent of petitioners' apartment expenses for 1974 or $ 4,523.58, and 76 percent of those expenses for 1975, or $ 4,929.05, [5] are allowable as deductions under section 212. We consider this allocation method, suggested in section 1.183-1(d)(2) Income Tax Regs. and exemplified in *584 section 1.183-1(d)(3) Income Tax Regs., to be a reasonable interpretation of the relevant statutory provisions, cf. Bingler v. Johnson, 394 U.S. 741 (1969), and, accordingly, adopt it for purposes of limiting petitioners' deductions for 1974 and 1975. As far as 1976 is concerned, specific statutory authority exists for limiting the deductions petitioners claimed in connection with their apartment. Section 280A(a) *585 provides as follows: (a) General Rule. -- Except as otherwise provided in this section, in the case of a taxpayer who is an individual or an electing small business corporation, no deduction otherwise allowable under this chapter shall be allowed with respect to the use of a dwelling unit which is used by the taxpayer during the taxable year as a residence. "Dwelling unit" is defined in section 280A(f)(1) to include an apartment or condominium. Since petitioners used the apartment for 20 days during 1976, the general rule of disallowance contained in section 280A(a) is operative. Section 280A(d)(1). [6] *586 The disallowance provision in subsection (a), however, does not apply to any item attributable to the rental of a dwelling unit. Section 280A(c)(3). The extent to which an item is so attributable is determined pursuant to subsection (e). Section 280A(e) provides: (1) In General. -- In any case where a taxpayer who is an individual or an electing small business corporation uses a dwelling unit for personal purposes on any day during the taxable year (whether or not he is treated under this section as using such unit as a residence), the amount deductible under this chapter with respect to expenses attributable to the rental of the unit (or portion thereof) for the taxable year shall not exceed an amount which bears the same relationship to such expenses as the number of days during each year that the unit (or portion thereof) is rented at a fair rental bears to the total number of days during such year that the unit (or portion thereof) is used. (2) Exception For Deductions Otherwise Allowable. -- This subsection shall not apply with respect to deductions which would be allowable under this chapter for the taxable year whether or *587 not such unit (or portion thereof) was rented. Finally, section 280A(c)(5) enunciates an overall limitation on, among other things, deductions attributable to rental use in cases where the dwelling unit is used by the taxpayer during the taxable year as a residence (as defined in section 280A(d)). Under section 280A(c)(5), deductions allowed by reason of being attributable to such rental use "shall not exceed the excess of-- (A) the gross income derived from such use for the taxable year, over (B) the deductions allocable to such use which are allowable under this chapter for the taxable year whether or not such unit (or portion thereof) was so used." The impetus for this labyrinthine disallowance formula stemmed from the belief that definitive rules were needed "to specify the extent to which personal use [of a so-called "vacation home"] would result in the disallowance of certain deductions in excess of gross income." H. Rept. No. 94-658, 1976-3 C.B. (vol. 2) 695, 856. Congress's chief concern in enacting section 280A (insofar as it relates to vacation homes) was that the judicial task of determining whether an activity was engaged in for profit was often difficult and time consuming. *588 Thus, "[i]n a case where personal use is the controlling factor to be considered, this approach would obviate the need to require subjective determinations to be made concerning the taxpayer's motive and the primary purpose for which the vacation home is held." H. Rept. No. 94-658, supra, at 856. Even though we have determined that petitioners were engaged in an activity for profit, it is manifest that, for the year 1976, the provisions of section 280A are controlling. Since petitioners' condominium, a "dwelling unit," was used for personal purposes for 20 days during 1976, the deductible expenses attributable to its rental use (excluding those which would be allowable regardless of rental use, sec. 280A(e)(2)), are initially determined pursuant to the subsection (e)(1) allocation formula. These expenses are computed according to the following ratio: days apartment is rented at fair rental total number of days used As this ratio is 85/105, or 81 percent, only 81 percent of the deductions proximately connected with the rental of petitioners' condominium are deductible as "expenses attributable to rental" under section 280A(e)(1).This figure is $ 5,878.49 (81 percent of $ 7,257.39). *589 [7]
A further computation under section 280A(c)(5) is necessary since the $ 5,878.49 figure cannot exceed the following amount: (A) Gross income from petitioner's rental use for the taxable year, $ 6,032, minus (B) Deductions which are allowable regardless of whether the property was rented (i.e. interest, taxes, casualty losses, etc., section 280A(b)) and which are allocable to rental use. In determining the portion of the otherwise allowable deductions which are allocable to the unit's rental use under (B), we believe the ratio allocation used in section 280A(e)(1) provides a reasonable basis for determining the appropriate amount. Indeed, this is the approach respondent has taken in the proposed regulations under section 280A. See sections 1.280A-3(d), (4), Proposed Income Tax Regs., 26 C.F.R. 52399, 52405-52406 (Aug. 7, 1980). Consequently, since 81 percent of petitioners' otherwise allowable deductions ($ 526.76 in real estate tax) relating to the unit is $466.77, the ceiling on deductions contained in section 280A(c)(5) equals $ 6,032 minus $ 466.77, or $ 5,565.23. *590 As a result, only $ 5,565.23 of petitioners' expenses attributable to rental of the condominium is deductible for the year 1976. Decision will be entered under Rule 155. Footnotes
1. James R. McKinney died after the trial and submission of briefs in this case. A motion to substitute the Estate of James R. McKinney as the petitioner was subsequently granted. For convenience, we will refer to James R. McKinney as the petitioner herein.↩
2. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, unless otherwise specifically indicated.↩
3. To support a finding that a profit motive was lacking, the Tax Court opinion in Carkhuff v. Commissioner, T.C. Memo. 1969-66, noted that the competitive position of the rental unit in question had deteriorated steadily because of the absence of air-conditioning, and that the taxpayers had not made any substantial effort to increase the property's attractiveness as a rental cottage.
4. See Copeland v. Commissioner, T.C. Memo. 1980-476↩. 5. These figures are obtained by (1) reducing the expenses petitioners reported on their 1974 and 1975 returns by the non-deductible "Owner's expense" and the expenses allowable in any event (real property taxes) and (2) multiplying the resulting figure for each year by the appropriate percentages. The excise taxes listed on petitioners' returns do not fall within any of the categories listed in section 164(a). However, that section provides that taxes may still be deductible under sections 162 or 212↩, if they are paid or accrued in carrying on a trade or business activity. The $ 607.86 and $ 600.85 in real property taxes for 1974 and 1975, respectively, are deductible in full while the excise taxes will be apportioned accordingly.
6. Section 280A(d)(1) provides: (1) In General. -- For purposes of this section, a taxpayer uses a dwelling unit during the taxable year as a residence if he uses such unit (or portion thereof) for personal purposes for a number of days which exceeds the greater of (A) 14 days, or (B) 10 percent of the number of days during such year for which such unit is rented at a fair rental. For purposes of subparagraph (B), a unit shall not be treated as rented at a fair rental for any day for which it is used for personal purposes. The greater number in the case before us is 14 days since the apartment was rented for only 85 days during 1976.
7. The $ 7,257.39 figure excludes the owners expense, and the real property taxes for 1976. See n. 5, supra↩.